# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEMETRICE SIGHTLER,<br><br>                       Plaintiff,<br><br>   vs.<br><br>CITY OF SAN DIEGO, et al.,<br><br>                      Defendants. | CASE NO. 15cv2235-LAB (DHB)<br><br>**ORDER PARTIALLY GRANTING**<br>**SUMMARY JUDGMENT** |

When Demetrice Sightler walked out onto his balcony on a September afternoon, he expected to find his girlfriend. Instead, he found himself surrounded by San Diego police officers with guns drawn. When Sightler asked why police had a machine gun pointed at him, the police said: "That's how we do business, okay?" A jury, not a judge, needs to decide whether that's an okay way to conduct business under the Fourth Amendment.

## Background

Three years ago, the San Diego Police received a 911 call from a mother who said her son was threatening to shoot his girlfriend. She identified her son as Benjamin Harmon: a 26-year-old black man living at 3659 Lemona Avenue in Apartment 5. An hour later, Demetrice Sightler, a 33-year-old black man, walked onto his balcony at Apartment 3.

More than ten officers surrounded Sightler and a helicopter hovered overhead. At least four officers had guns pointed at him. Sightler complied with commands to put his hands up. He told police he had no weapons. For the next ten minutes, an officer trained an AR-15 with a red-lit optic on Sightler. The police told Sightler to walk through his apartment

and surrender to them at his front door. Sightler refused. He didn't want to turn his back with a gun aimed at him. Sightler repeatedly told the officers his name, and explained they had the wrong apartment. Eventually, the police located a picture of their suspect, Benjamin Harmon, and confirmed he wasn't Demetrice Sightler. They lowered their guns and told Sightler he could go back into his apartment.

 

Sightler sued the four officers who aimed guns at him, the two commanding officers on scene, and the City of San Diego under 42 U.S.C. § 1983 alleging violations of his Fourth Amendment rights. Defendants moved for summary judgment.

**Analysis**

The court must grant summary judgment if Defendants show there's no genuine dispute as to any material fact. Fed. R. Civ. P. 56. Viewing the facts in the light most favorable to Sightler, a jury could find the police violated his rights by holding him at gunpoint. The Court denies Defendants' motion for summary judgment for the six officers on Sightler's claims for (i) unreasonable seizure and (ii) excessive force. The Court grants summary judgment for the City on Sightler's claims alleging (i) a policy of excessive force in arresting black citizens, (ii) failure to train, and (iii) failure to supervise.

**I.      The Officers**

Defendants failed to meet their burden because they didn't explain why each individual officer was entitled to judgment for their particular actions. But even if they had analyzed each officer individually, the Court would still find they all need to stand trial. "An officer's liability under section 1983 is predicated on his 'integral participation' in the alleged violation." That doesn't require that "each officer's actions themselves rise to the level of a

constitutional violation"; rather, it "require[s] some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007) (alterations omitted). A jury may find some officers liable and others not, but the Court finds they were all integral participants. That's because the core conduct that restricted Sightler's liberty in an unreasonable way was pointing guns at him. The parties agree Longen, Levin, Johnson, and Hupp all pointed loaded guns at Sightler. Nislet and McClain didn't point guns, but as the commanding officers on scene, they failed to order the four officers to lower their guns. There's also sufficient evidence to find them liable for their inaction in the supervision and control of their subordinates. *Preschooler II v. Clark Cty. Sch. Bd. of Trustees*, 479 F.3d 1175, 1183 (9th Cir. 2007).[1]

1. **Unreasonable Seizure**

The Fourth Amendment bans unreasonable seizures. Both sides agree a seizure occurred. But Defendants maintain they performed a *Terry* stop based on reasonable suspicion. Sightler argues the police arrested him without probable cause. The Court finds the police arrested Sightler, but it's a question for the jury whether they had probable cause.

A. **Arrest**

The Court finds an arrest occurred based on *Kraus v. Pierce Cty.*, 793 F.2d 1105 (9th Cir. 1986). In *Kraus*, a witness reported a license plate to police after he witnessed an armed man commit an ATM robbery, and then saw a car speed away. The police located the address that matched the plate. When the officers arrived at the suspect's address, they "decided to surround the front of the house, draw their weapons, bring the occupants out of the house, shine floodlights on them, and then interrogate them." *Id.* at 1107. At least five officers aimed guns at the two occupants who came out of the house. After "some period of observation" the police realized they had the wrong people, questioned them, and left. The

---

[1] The police video suggests Hupp and Johnson only pointed guns at Sightler initially. But the video starts at some unknown time, and Defendants admit Hupp and Johnson periodically pointed guns at Sightler. Also, McClain was in charge, but Nisleit agreed he was the ranking officer and "gave direction to McClain," Longen, and Harbin. So he's in as well. [Dkt. 69-7 at 27 and Dkt. 62-19.]

Ninth Circuit found this conduct amounted to an arrest because "[a] reasonable person in this situation would have believed that he was not free to leave and was effectively under arrest." *Id.* at 1109. Since this case turns on the same salient facts as *Kraus*, the Court finds the police arrested Sightler.

This conclusion is confirmed by the analysis laid out in *Washington v. Lambert*, 98 F.3d 1181 (9th Cir. 1996). To decide if stops have turned into arrests, courts consider "how intrusive the stop was" with the justification for the intrusiveness "given the specific circumstances." *Id.* Both sides agree the police held Sightler for ten minutes at gunpoint. Thirteen officers surrounded the building, along with a canine unit, and a helicopter. This type of intrusion on an innocent citizen who unknowingly walks out onto their home's balcony is extreme.

To decide if the police deployed justifiable tactics, the Court considers "whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *Id.* at 1185. Specific factors include whether the suspect is uncooperative, if he's currently armed, and if the stop follows a violent crime. It's true that from the officers' perspectives, someone who stepped onto the balcony might be a violent person with a gun. But in *Kraus*, police also believed the resident who stepped out of the house might be a violet person with a gun. That fact didn't alter the Ninth Circuit's finding of an arrest.

Defendants raise two points. First, they maintain Sightler's responsible for extending the stop because he refused "to comply with the officers' instructions to go through the apartment and surrender to the officers near his front door." [Dkt. 62-1 at 13.] That's unpersuasive. Sightler did what you'd expect: he refused to move because he was afraid he might get shot. The cops also say they pointed guns at Sightler because they feared he might have a weapon inside his apartment. If true, then it wouldn't make sense to order Sightler to walk into his apartment. Second, Defendants argue Sightler wasn't handcuffed or physically restricted: "there was nothing the officers could do to prevent [Sightler] from going back into his apartment." [Dkt. 71 at 3.] They had an AR-15 aimed at Sightler for ten minutes. Imminent death is a more powerful deterrent to movement than handcuffs.

### B. Probable Cause

Police have probable cause to arrest someone without a warrant where, "under the totality of the facts and circumstances known to the arresting officer, a prudent person would have concluded that there was a fair probability that the suspect had committed a crime." *United States v. Struckman*, 603 F.3d 731, 739 (9th Cir. 2010). There's two related questions here: Did the cops reasonably misidentify the balcony? And did the cops reasonably misidentify Sightler? Because both answers are close calls that require evaluating if the officer's acted reasonably, a jury should decide if they had probable cause.

On the one hand, it's understandable why the police thought Sightler was their guy. They were looking for a young black man who had his girlfriend at gunpoint. When a young black man walked onto the balcony the officers believed was attached to Apartment 5, they thought he might be Harmon. That's especially true because the mother who called only offered a general description of Harmon as a 26-year-old black man with black hair. And while she provided the right apartment number, she also provided the wrong birthdate, which delayed efforts to identify Harmon. Sightler explained who he was, but police don't need to take someone's word when they're trying to stop someone else from getting killed.

On the other hand, a jury could find the police didn't have enough information to connect the balcony to Apartment 5. For example, Defendants say they believed they had the right balcony because Officer Mendez and Cooper told them so. But Mendez "advised over the radio it was 'unknown' whether the apartment had access to the balcony." [Dkt. 82 at 7.] The officers also had the phone number for the victim—Harmon's girlfriend—about 20 minutes before Sightler stepped onto his balcony. Yet, they didn't obtain information about the balcony or suspect. Worse, Sightler's girlfriend came home during the encounter. She explained the mistake, but the police continued to hold Sightler at gunpoint. Finally, Officer Longen says he pulled up Harmon's photo on his ride over. Longen had the same information as the other officers. If he could find Harmon with the wrong birthdate, why couldn't they? A jury could find it was unreasonable the police failed to obtain more information about the apartment layout, Harmon, and Sightler.

Defendants argue they reasonably relied on other officers who identified the balcony. It's true that officers aren't required "to second-guess the earlier steps already taken by [ ] fellow officers." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). But reliance on other officers "is only allowed when it is objectively reasonable." *Green*, 751 F.3d at 1045. A jury could find the reliance here wasn't reasonable. Cooper never confirmed the balcony belonged to Apartment 5, Mendez explicitly stated it was "unknown," and McClain admitted he expected his subordinates "to use their own judgment" to decide if the balcony belonged to Apartment 5. [Dkt. 82 at ¶¶ 11, 19, 21.][2] A jury should decide if the reliance here was reasonable. *See Green*, 751 F.3d at 1046 (reversing for jury to decide because officers "have an ongoing duty to make appropriate inquiries regarding the facts" "if insufficient details are relayed").

The Court understands the police's point of view. They believed the person who stepped onto the balcony was likely their guy. But you can only take that logic so far. If a child stepped onto the balcony, Defendants would agree they couldn't train their guns on him. Not because of age, but because he wouldn't match the suspect's description. Underlying this case is the more invidious problem that officers were looking for a black man, saw a black man, then pointed their guns at a black man. Targeting someone based on their race alone isn't good enough. Because there's a triable issue whether the police had probable cause, and ultimately whether this seizure was unreasonable, summary judgment on this claim is **DENIED**.[3]

### 2. Excessive Force

The Court asks "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The issue here is straightforward:

---

[2] McClain implies Cooper identified the balcony as belonging to Apartment 5, but Cooper's testimony, and the undisputed facts, are silent on this point. [Dkt. 62-5. and Dkt. 62-18.]

[3] Even if this was a *Terry* stop, the Court would still find a jury needed to decide if (i) the officers had reasonable suspicion; and (ii) whether the length and scope of the stop was reasonable. *See Green*, 751 F.3d at 1046 (9th Cir. 2014).

could a jury find that pointing guns at Sightler was objectively unreasonable? To answer the question, courts consider: (1) the force used; (2) the severity of the reported crime, if the suspect posed an immediate threat, if the suspect resisted; and (3) the Court balances the intrusion on the suspect with the government's need for the intrusion. *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003). The analysis here overlaps with the issues above.

First, the police used extreme force. Having a gun pointed at you, especially for ten minutes, is as serious as it gets. Sightler testified he was afraid that "if he made any movements at all, the officers would fire at him." [Dkt. 62-12 at 21.] Defendants argue Sightler failed to show "the risk of injury was high" because there's no evidence "Longen had his finger on the trigger or anything that made the risk high such as pointing the weapon directly at Plaintiff's head." [Dkt. 71 at 6.] That's a distinction without a difference. Whether Longen aimed his gun at Sightler's head or heart doesn't reduce the risk of death.

Second, it's true the reported crime was severe. But Sightler held his hands up, and repeatedly provided exonerating information. The video also captures Hupp yell, "He's cooperating." Defendants argue the officers didn't know if Sightler was armed because he was on an elevated balcony—they couldn't rule out other guns on the balcony, on him, or stashed inside. Defendants can argue those points to the jury. The cops presumably have binoculars and scopes, and it's undisputed a helicopter was overhead. Viewing the evidence in the light most favorable to Sightler, a jury could conclude he wasn't a threat.

Third, on balance, a jury could find the force here was too great an intrusion, even given Defendants' interest in stopping a serious crime. As the Ninth Circuit explained, "at the very least, [the officers] could have held their weapons at a 'low ready' position rather than pointing them directly" at the suspect. *Green*, 751 F.3d at 1050. Defendants haven't shown this is the rare case where the undisputed facts show no reasonable jury could find for Sightler. *Chew v. Gates,* 27 F.3d 1432, 1443 (9th Cir.1994). The motion for summary judgment on the excessive force claim is **DENIED**.

II.     **Qualified Immunity**

"In determining whether an officer is entitled to qualified immunity, we consider (1)

whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017). Since a jury could find Defendants violated Sightler's Fourth Amendment rights, the only question is whether reasonable officers would have known the law clearly prohibited their conduct. That doesn't require a "case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (alterations omitted).

### 1. Unlawful Arrest

*Kraus* provides sufficient precedent "where an officer acting under similar circumstances" "was held to have violated the Fourth Amendment." *Id.* at 552. In *Kraus*, police held the wrong person at gunpoint based on unverified information that associated Kraus's car with the armed robber. Here, the police held the wrong person at gunpoint based on unverified information that associated Sightler's balcony with the armed neighbor. In *Kraus*, the Ninth Circuit reversed an order granting qualified immunity because a reasonable officer should have known that holding cooperative suspects at gunpoint based on incomplete and unverified information linking them to property associated with the crime was an unreasonable seizure. *Kraus*, 793 F.2d at 1110 (9th Cir. 1986); *see also Green*, 751 F.3d at 1052 (9th Cir. 2014). Qualified immunity for the unlawful arrest claim is **DENIED**.

### 2. Excessive Force

*Robinson* provides sufficient precedent where officers used excessive force under similar circumstances as this case. In *Robinson*, police responded to a home after a report the suspect had shot two dogs. When the police arrived, Robinson walked out of his home, unarmed, and two officers pointed guns at him. Here, Sightler walked out of his home, unarmed, and four officers pointed guns at him. The Ninth Circuit was clear: "pointing a gun to the head of an apparently unarmed suspect during an investigation can be a violation of the Fourth Amendment, especially where the individual poses no particular danger." *Robinson v. Solano Cty.*, 278 F.3d 1007, 1015 (9th Cir. 2002); *See also Green*, 751 F.3d at 1052. Qualified immunity for the excessive force claim is **DENIED**.

Defendants argue the officers believed Sightler may have recently committed a crime with a gun. But that belief isn't sufficient to justify qualified immunity. Because in *Kraus* and *Robinson*, the police also believed the citizens they held at gunpoint had committed serious crimes with a gun: The police believed Kraus had just committed an armed robbery; they believed Robinson had just used his shotgun to kill two dogs. The Ninth Circuit clearly explained that "earlier use of a weapon" is "insufficient to justify" a pointed gun when the person is cooperative and unarmed. *Robinson*, 278 F.3d at 1014 (9th Cir. 2002).

**II.      City of San Diego**

Sightler's opposition failed to offer any legal argument for his claims against the City. Instead, his facts section offers conclusory statements that string cite to evidence; his argument section lists general legal principles. He hasn't explained how the law applies to the facts. The Court finds on this basis alone Sightler's waived these causes of action by failing to oppose. The Court parsed through his fact citations nonetheless, but finds these causes of action lack any evidentiary support a jury could rely on to find for Sightler.

**1.      Practice of Unreasonable Seizures**

A city is liable under § 1983 when it has an unconstitutional policy or practice that was the moving force behind the constitutional violation. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). Sightler's theory seems to be that the City of San Diego has a practice "of using excessive force to detain and arrest Black and Brown citizens without reasonable suspicion or probable cause." [Dkt.69 at 14.]

The evidence Sightler identifies isn't on point. He refers to deposition testimony that he didn't live in an affluent area, that people in his neighborhood were "messed with by the cops," and that Nisleit told him: "I hope you don't run into any of these [officers] again." [Dkt. 69-6.] He cites a San Diego State research paper on traffic stops. But he doesn't provide any argument for how the paper applies to his theory. The report isn't probative anyway. For example, it concluded: "No meaningful difference existed in the rate at which drivers from each racial/ethnic group were arrested." [Dkt. 71-1 at 71.] Summary judgment on this claim is **GRANTED**.

### 2. Failure to train

Only where the "failure to train amounts to deliberate indifference" is a city potentially liable under § 1983. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). Sightler offers a conclusory sentence that training was inadequate, and then references testimony by Hupp and Johnson where they can't recall a few training terms on use of force. He also cites his police expert's testimony that "a similarly trained San Diego Police Department officer would not have considered Mr. Slighter to be a lethal threat." [Dkt.69-1 at 322–23.] That suggests San Diego provides fine training. There's no evidence here of deliberate indifference. Summary judgment on this claim is **GRANTED**.

### 3. Failure to supervise

Sightler's theory here is unclear. If he's alleging claims against Nisleit and McClain, the Court's addressed those issues above. But his complaint states this claim is against "the City of San Diego and All Doe Policy-makers." Doe policymakers apparently refers to people like "the current SDPD Chief" and the "Assistant Chief" who Sightler said he might name as defendants, but never did. [Dkt. 20 at 3.] Summary judgment on this claim is **GRANTED**.

## Disposition

The Court is reluctant to expose officers to liability when they answer an emergency call under the belief that a fellow citizen has a gun held to her head. At the same time, fellow citizens shouldn't have to experience the terror of an AR-15 pointed at them for ten minutes on a fall afternoon—especially when they are at home.[4] Defendants' motion for summary judgment is granted in part, and denied in part.

**IT IS SO ORDERED**.

Dated: March 28, 2018

*[signature]*
**HONORABLE LARRY ALAN BURNS**
United States District Judge

---

[4] Neither party addressed that this encounter happened at Sightler's home. The Court declines to analyze the issue, but highlights it for the parties to consider. *See Hopkins v. Bonvicino*, 573 F.3d 752, 759 (9th Cir. 2009); *Payton v. New York*, 445 U.S. 573, 590 (1980).